IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO. 5:11-CV-00721-BO

| | |
|---|---|
| SHELCO, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| SHAUN DONOVAN, in his official capacity as | ) **ORDER** |
| SECRETARY OF THE UNITED STATES | ) |
| DEPARTMENT OF HOUSING & URBAN | ) |
| DEVELOPMENT, and BERKADIA | ) |
| COMMERCIAL MORTGAGE, LLC, | ) |
| | ) |
| Defendants. | ) |

This matter is before the Court on defendant Lenox Mortgage XVII LLC's ("Lenox") motion for summary judgment [DE 71], defendant Shaun Donovan's ("HUD") motion for summary judgment [DE 90], plaintiff Shelco, Inc.'s ("Shelco") motion for partial summary judgment [DE 92], and defendant Berkadia Commercial Mortgage, LLC's ("Berkadia") motion for summary judgment [DE 94]. The motions are now ripe for adjudication. For the reasons stated herein, plaintiff Shelco's motion for partial summary judgment is GRANTED, defendant Berkadia's motion for summary judgment is GRANTED, and defendants HUD and Lenox's motions for summary judgment are DENIED.

## BACKGROUND

This action arises out of the construction of an apartment project located in Raleigh, North Carolina, commonly known as Windsor Manor Six Forks ("Project"). Shelco was a contractor in the construction of the Project. Shelco filed this action in the Superior Court of Wake County, North Carolina on November 3, 2011 against HUD and Berkadia asserting,

among other claims, an equitable lien on funds held by Berkadia and HUD in the principal amount of $700,754 plus interests and costs on the grounds that Shelco fully performed its work on the Project, but was not paid for that work. Shelco alleges that HUD has been unjustly enriched by Shelco's work and is accordingly liable to Shelco for a federal common law equitable lien.

HUD removed this case to this Court pursuant to 28 U.S.C. § 1442(a)(1). Pursuant to this Court's previous orders, the remaining claims against defendants are: a claim for an equitable lean against all three defendants, a claim for recovery as a third party beneficiary against HUD and Lenox, and a claim for negligence against Lenox. On August 2, 2012, Lenox filed a motion to substitute Lenox as a defendant for HUD or, alternatively, to be joined with HUD as an additional defendant. This Court denied Lenox's motion to substitute, but granted Lenox's request to be joined as a defendant in this action.

## FACTS

The owner/developer of the Project was W.M. Six Forks, LLC ("Owner"), a single asset limited liability company formed for the purpose of developing and owning the apartment project. The Project was developed under HUD's Section 221(d)(4) mortgage insurance program. The Project was financed by a HUD insured mortgage loan made by Capmark Finance, Inc. pursuant to which 1) Capmark entered into a Building Loan Agreement with Owner dated July 22, 2008, and 2) HUD entered into a regulatory agreement for multi-family housing projects with Owner on the same date, among other agreements. The amount of the loan made by Capmark to Owner and insured by HUD was $36,587,800. Capmark filed bankruptcy and Berkadia acquired Capmark's mortgage business, including the loan at issue in this dispute.

2

Owner also executed a promissory note and deed of trust in favor of Capmark and entered into a construction contract with Boylan Development Company ("Boylan"), a related company whose principal owner was the managing member of Owner. This arrangement was approved by HUD which also promulgated the forms for all of the primary documents used to reflect the loan and construction agreement, including but not limited to the note, deed of trust, regulatory agreement, building loan agreement and construction contract. For these types of HUD insured projects, the loan is always "in balance," meaning the lender always has all of the money to complete the project (loan amount plus any necessary contributions from the owner) and always has access to that money. The lender never declared the loan in default for being "out of balance" in this case. In 2009, Capmark assigned the Owner's loan and all documents and agreements relating to the loan to Berkadia.

Although the primary construction contract for the Project was between Owner and the related Boylan, the Owner actually contracted directly with a number of other contracters for performance of portions of the project. One such contract was with Shelco for the construction of a six-level pre-cast concrete parking deck on the project. Shelco's contract with the Owner was in the amount of $6,148,457 and was amended by change orders to a final contract value of $6,228,648. According to HUD's contractor's and/or mortgagor's cost breakdown, which gives a breakdown of the construction contract, a value in excess of $8 million was assigned to "accessory structures" and the property insurance schedule listed the insured value of the garages, which Shelco constructed, as $7,703,833, an amount in excess of Shelco's contract price.

Construction of the Project occurred from late summer 2008 through early 2010. Contractors submitted monthly applications for payment to the Owner, which then submitted a

3

monthly mortgage draw request to Capmark, (subsequently Berkadia). HUD reviewed and approved the construction plans and specifications, the construction contract, and all requests for construction changes. HUD also monitored the progress of construction and the contractors' compliance with the plans and specifications. The Owner's construction contracts with Boylan and Shelco called for ten percent of each monthly payment application to be "held back" until substantial completion of the project. Both contracts provided that the ten percent retainage would be paid when work was completed, inspected, and approved by local government officials, certificates of occupancy were issued, and HUD also certified completion and readiness of the project for occupancy. Similarly, the building loan agreement provided that the full principal amount of the construction loan would be disbursed upon these same conditions and upon HUD's approval of release of the "hold back."

By late 2009, Shelco had completed in excess of 90% of its contract work for construction of the garage. However, the Owner fell in arrears in its payments to Shelco and other contractors, causing Shelco and others to temporarily suspend their work on the project. In January of 2010, Shelco and Owner executed a cure agreement which paid Shelco the past due amounts and arranged for Shelco to complete its work. In February 2010, Shelco filed a lien on the Project. Shelco and the other contractors did complete construction of the project, and the architect certified final completion and permission to occupy on April 1, 2010. HUD's representative certified the entire project was 100% complete as of April 1, 2010, and, as of that date, the architect had approved the project for occupancy and the contractor and architect had submitted all final inspection documents. The HUD representative's report of June 10, 2010 noted that the project was 100% complete and that the Owner's final payment requisition had been approved on April 1, 2010 without modification. The Owner's attorneys represented that

4

HUD also issued its form 92485 – final permission to occupy certificates – and allowed leasing and occupancy of the project beginning in the spring of 2010.

Shelco and a number of the other contractors were not paid in full despite the successful completion of the project. Thereafter, Shelco and other contractors filed liens against the project. In the summer of 2010, the Owner attempted to reach settlements with the various contractors and subcontractors still owed money for their work on the project by utilizing approximately $2.3 million remaining out of a $4 million "completion assurance fund" which HUD had required the Owner to secure with a letter of credit at the beginning of the Project. The Owner reached settlements with the majority of the unpaid contracts, subcontractors and lien claimants ("Claimants") by paying them approximately 54% of their respective claim amounts. Shelco and others did not settle with the Owner.

In making settlement offers to the Claimants, counsel for investors in the Owner disclosed that there remained an undisbursed construction loan balance of approximately $1 million that could be made available for payment to the unpaid contractors. Thereafter, Shelco served a notice of equitable lien on September 13, 2010 on the undisbursed construction loan balance upon counsel for the investors, the Owner, Berkadia, and HUD. No other contractors asserted an equitable lien.

After receiving notice of Shelco's equitable lien, the lender continued to pay itself interest on the loan, and used the initial operating deficit ("IOD") account to fund the interest payments. The Owner also requested that HUD approve use of the remaining loan balance to pay the unpaid contractors including Shelco. The lender admits that the undisbursed loan proceeds could have been disbursed prior to February 1, 2011, and that the project would "cost certify," meaning that the total costs to build the project exceeded the loan amount such that the full

5

amount of the loan could have been disbursed. Berkadia approved the request to disburse the remaining loan balance and prepared the necessary HUD paperwork to request a disbursement of the loan proceeds in excess of $1 million, but never forwarded that request to HUD because Berkadia thought it would be "bad policy" to encourage HUD to make an advance of loan proceeds for which HUD had to pay insurance.

Shelco filed a claim of lien against the W.M. Six Forks property pursuant to the North Carolina lien statutes, and obtained judgment from the Wake County Superior Court on May 31, 2011 in the amount of $700,754 plus interest at the legal rate of eight percent from March 17, 2011 and attorney's fees. The court judgment also declared that Shelco was entitled to enforce its lien against the Owner's property. However, because Shelco's lien was subordinate to the deed of trust in favor of Capmark (subsequently assigned to Berkadia and then HUD), Shelco has been unable to enforce the judgment or collect any money thereon. The principal amount awarded to Shelco represents Shelco's contract retainage in the amount of $630,431 withheld by the Owner during construction, as well as the balance of $70,323 owed under monthly payment applications.

Approximately six months after Shelco served its notice of equitable lien, Berkadia declared the Owner in default under its loan for failing to make certain loan payments in March 2011. In September 2011, pursuant to HUD regulations, Berkadia assigned the mortgage loan, deed of trust, and related loan agreements and documents to HUD in exchange for payment of insurance benefits. The undisbursed construction loan balance in excess of $1 million had not been disbursed prior to the assignment of the loan to HUD. Although correspondence referring to the undisbursed loan balance stated that it was approximately $1,035,000, HUD admits that the

6

lender made insurance advances under the loan of all except $1,079,251 of the original mortgage amount. In July 2012, HUD sold the note and mortgage to defendant Lenox.

In August 2012, the Owner filed a petition for relief under Chapter 11 of the United States Bankruptcy Code in the Bankruptcy Court for the Eastern District of North Carolina to stay foreclosure and receivership actions initiated by Lenox in North Carolina state court. The Owner identified Shelco as one of its twenty largest unsecured creditors in its petition and also identified Shelco as holding a secured claim based on Shelco's filed contractor's lien on the Project. The Owner also identified Lenox as its largest secured creditor. The bankruptcy court issued a notice of Chapter 11 bankruptcy case, meeting of creditors and deadlines and set December 17, 2012 as the deadline for creditors to file a proof of claim in the bankruptcy case. Sheco did not file a proof of claim in the bankruptcy case. Lenox timely filed a proof of claim for $39,027,860 owed on the loan as of the petition date.

The Owner filed a plan of liquidation in the bankruptcy case that provided for a sale of all assets of the Owner's bankruptcy estate free and clear of all liens, claims, and interests to §§ 1141 and 363(f) of Title 11 of the bankruptcy code. The plan provided for payment of an estimated 13% pro rata amount of the claims held by contractor and subcontractor lien claimants, including Shelco, and general unsecured creditors from a fund of not less than $1,435,500 created by Lenox under the terms of the plan. Shelco did not object to the proposed plan. The bankruptcy court approved the plan, and the bankruptcy sale was held. Lenox's "stalking horse" bid was the only one submitted before the deadline, and the bankruptcy court approved the sale to Lenox for $37.1 million on March 27, 2013. This sale extinguished Shelco's state law lien and prevented it from recovering under the judgment awarded by the state court.

7

Case 5:11-cv-00721-BO Document 110 Filed 10/29/13 Page 7 of 19

## DISCUSSION

A motion for summary judgment cannot be granted unless there are no genuine issues of material fact for trial. FED. R. CIV. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The moving party must demonstrate the lack of genuine issue of fact for trial and if that burden is met, the party opposing the motion must "go beyond the pleadings" and come forward with evidence of a genuine factual dispute. *Celotex*, 477 U.S. at 324. The Court must view the facts and the inferences drawn from the facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986). Conclusory allegations are insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.") (emphasis in original).

I.  BERKADIA'S MOTION FOR SUMMARY JUDGMENT.

Shelco claims to have asserted an equitable lien that extends over the completion assurance fund that it alleges was not used to pay contractors, vendors, subcontractors or supplies. However, Shelco never asserted an equitable lien claim over the completion assurance funds in its complaint. It has only asserted an equitable lien upon the undisbursed construction loan proceeds. In its May 31, 2012 order, this Court found that Berkadia's liability in this matter as to plaintiff's equitable lien claim survived a 12(b)(6) motion, but only up to the amount of any payments to other contractors with no liens or liens junior to plaintiff's made after plaintiff's demand to Berkadia, but prior to Berkadia's assignment to HUD. Because Shelco has only alleged an equitable lien claim as to the undisbursed construction loan proceeds, this Court need only look to determine whether Berkadia made any payments from the undisbursed construction

loan proceeds to other contractors with no liens or liens junior to Shelco's lien. This covers the period from September 13, 2010 to September 20, 2011.

It is undisputed that Berkadia made no payments from the undisbursed construction loan proceeds to other contractors with no liens or liens junior to Shelco's during this timeframe. Accordingly, Berkadia's motion for summary judgment is granted, and Berkadia owes no liability to Shelco in this matter.

II.     SHELCO'S MOTION FOR PARTIAL SUMMARY JUDGMENT.

Shelco moves for partial summary judgment as to its equitable lien claim against HUD. Shelco argues that when HUD accepted the assignment of the deed of trust on the Project from Berkadia, it received a fully complete and operational apartment project, including the parking garage constructed by Shelco, and that this represented the full security contemplated by the mortgage loan in the amount of $36,587,800 which HUD agreed to insure at the beginning of the project. Shelco alleges that HUD, in turn, has received the benefit of being able to sell and assign the deed of trust for a fully completed project to Lenox and that despite receiving the benefit of a completed project, HUD did not advance or insure the final $1,078,000 of the original mortgage loan which, in part, represented amounts due to Shelco. Accordingly, Shelco alleges that HUD was unjustly enriched at the expense of Shelco and is liable to Shelco pursuant to Shelco's notice of equitable lien in the undisbursed loan balance.

Plaintiff and defendants disagree about whether federal or North Carolina law is controlling on this matter. Defendants are generally correct that the type of substantive law to be applied is unaffected by removal under 28 U.S.C. § 1442(a). However, here, federal common law applies to Shelco's equitable lien claim for the type of federally insured HUD project at issue because the North Carolina state court had concurrent jurisdiction over this claim which is

governed by federal common law. *See Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 477–78 (1981) (holding the general principle of state-court jurisdiction over cases arising under federal law allows state to assume subject-matter jurisdiction over a federal cause of action absent provision to the contrary by Congress or a disabling compatibility between the federal claim and state court adjudication). Further, the line of cases examining equitable lien claims in HUD-insured projects apply federal common law in state court actions removed under 28 U.S.C. § 1442(a). *See C.D. Barnes Assocs. v. Grand Haven Hideaway Ltd. P'ship*, 2008 WL 4534152 (W.D. Mich. Sept. 30, 2008) (relying exclusively on federal common law cases in discussing an equitable lien claim removed under § 1442(a)); *Trans-Bay Eng'rs & Builders, Inc. v. Hills*, 551 F.2d 370, 377 (D.C. Cir. 1976) ("The claim of right is dependent on federal common law).

The Fourth Circuit has found two requirements to the imposition of an equitable lien: "First there must be an identifiable res upon which an equitable lien can attach, and second, the facts of this case must give rise to an equitable lien." *Spring Constr. Co. v. Harris*, 562 F.2d 933, 937 (4th Cir. 1977).

    A.    Identifiable Res.

Shelco argues that the undisbursed loan proceeds in the amount of $1,079,251, constitute an identifiable res. Indeed, "the balance of the undisbursed loan proceeds [] constitute an identifiable res, their purpose being to compensate those who further the housing projects, including the contractors." *Spring*, 562 F.2d at 937 (citing *Trans-Bay*, 551 F.2d 370; *Bennett Constr. Co. v. Allen Gardens, Inc.*, 433 F. Supp. 825, 835 (W.D. Mo. 1977)). Defendants argue that, in this case, an identifiable res should not be found in the undisbursed loan proceeds because the Owner defaulted on the loan prior to the date the plaintiff asserted an equitable lien.

10

Here, plaintiff first asserted its equitable lien on September 13, 2010. The first payment default did not occur until February 1, 2011. Defendants argue, however, that there were earlier defaults that occurred when Shelco and other contractors stopped work because they were not being paid, and when Shelco and other contractors filed liens on the Project. Defendants argue that these defaults eliminated Berkadia's (the mortgage holder at the time of these events) obligation to make any payments under the loan and therefore there were no "undisbursed proceeds" against which Shelco could file a lien. The Court agrees that this would be the case if the earlier events were truly construed as defaults which eliminated Berkadia's obligations, but in this case, Berkadia continued to make payments of interest due on the loan throughout its ownership of the loan, including payments that occurred after the initial "defaults" alleged by defendants. It strikes the Court that one cannot use the status of the loan as both a sword and a shield, in one instance making sure interest payments are made regardless of the loans' "default," and in the other alleging that there is no identifiable res against which plaintiff can file a lien because the loans were in "default" before the lien was filed. *See Trans-Bay*, 551 F.2d at 381 ("Even if there was an out of balance condition, there is some doubt whether the condition that existed constituted an immediate material breach of the Building Loan Agreement, a doubt reinforced by the fact that MORH paid the June, July and August interest payments"). Further, the lender admitted that the undisbursed loan proceeds could have been disbursed prior to February 1, 2011, suggesting that there was no immediate material breach prior to this date.

Accordingly, this Court finds that the undisbursed loan proceeds constitute an identifiable res in this case.

11

B.   Facts Giving Rise to an Equitable Lien.

Shelco argues that HUD is unjustly enriched as a matter of law when it takes assignment of a fully completed project, but has not authorized the full disbursement of the construction loan it insured. Defendants argue that the finding of an equitable lien only applies in cases where HUD created and directed not-for-profit entities to construct low income housing, while contractually depriving third part contractors of their state law remedies, which is not the case here. The Court finds that, in accordance with most federal cases on the matter, that the facts in this situation give rise to an equitable lien.

The Fourth Circuit found that an equitable lien arises where HUD has been unjustly enriched by receiving a project improved by a contractor's uncompensated services. *Spring*, 562 F.2d at 937–38. The Fourth Circuit's holdings are binding on this Court, but defendants attack the *Spring* decision by pointing out that the court in *Spring* relied on *Trans-Bay*, 551 F.2d 370, in which the D.C. Circuit noted that the owner entities in the case were "creatures of HUD." *Trans-Bay*, 551 F.2d at 382. Indeed, in the *Spring* case the owner entities were "nonprofit, nonasset corporations." *Spring*, 562 F.2d at 935. However, the Fourth Circuit did not distinguish between the type of HUD project or the type of owner in discussing the facts giving rise to an equitable lien. *Id.* at 937–38. Rather, the court announced the principle of unjust enrichment straightforwardly – by not advancing the full amount of the loan HUD committed to insure, it is unjustly enriched if it is not required to compensate contractors for the work performed. *Id.* at 937. An analysis of federal cases in other circuits supports this Court's conclusion that the facts here give rise to an equitable lien.

Defendants highlight the non-profit status of the owners in *Trans-Bay*, *Spring*, and *Bennett*, and the degree to which HUD was involved in being the driving force behind the

12

project. They contrast these three cases with the Fifth Circuit's decision in *Van-Tex, Inc. v. Pierce*, 703 F.2d 891 (5th Cir. 1983), the Massachusetts district court's decision in *Taylor Woodrow Biltman Constr. Corp. v. Southfield Gardens Co.*, 534 F. Supp. 340 (D. Mass. 1982), and the Southern District of New York's decision in *United States v. Big Apple Indus. Bldgs., Inc.* 1993 WL 437787 (S.D.N.Y. Oct. 26, 1993).

In *Van-Tex*, the Fifth Circuit considered a section 221(d)(4) project like the Project here, and rejected claims for an equitable lien in this for profit context. The Fifth Circuit stated that the "unarticulated premise of unjust enrichment and the central issue here must be whether HUD created a reasonable expectation that HUD would make good on any sums rightfully due it under the construction contract and was as a result unjustly enriched." *Van-Tex*, 703 F.2d at 897. The court continued, "When other remedies are available, the basis for such an expectation, and for a conclusion that HUD was responsible for it, becomes attenuated." *Id.* However, *Van-Tex* is distinguishable from this case in that the owner there was credit worthy with assets in addition to the mortgaged property. *Id.* Additionally, the contractor's majority owner in *Van-Tex* was also a general partner in the owner entity, which is not the case with Shelco. *Id.* Here, the Owner was a single asset entity, and filed for bankruptcy after defaulting on the loan after Shelco completed construction.

In *Taylor Woodrow*, the district court cited "the non-profit, assetless status of the owner" as the crucial factor in finding unjust enrichment. *Taylor Woodrow*, 534 F. Supp. at 348. Further, the court held that the contractor had an adequate remedy at law which precluded recovery on an unjust enrichment basis. *Id.* However, the situation in *Taylor Woodrow*, like in *Van-Tex*, is distinguishable from the situation before this Court. In *Taylor Woodrow*, the contractor apparently failed to pursue its lien rights against the owner's property, and the owner held more

13

assets than just the project on which the contractor worked. Here, the Owner filed for bankruptcy, extinguishing Shelco's lien and judgment pursued and obtained in state court, and Owner is a single-asset limited liability corporation.

In *Big Apple*, the court distinguished *Trans-Bay* and its progeny on the basis that those cases involved government-created entity owners and projects in which HUD exercised "pervasive influence." *Big Apple*, 1993 WL 437787 at *4. Additionally, the court noted that Big Apple was engaged in traditional marketplace activities and that a government loan did not interfere with the contractors to assess the risk of non-payment and pursue traditional state law remedies. *Id.* at *5. *Big Apple* is distinguishable from this case much as *Taylor Woodrow* is.

Although defendants note that plaintiff should have taken more and better steps to insure that it would be paid, under defendants' theory, Shelco is forced to bear the disproportionate risk of nonpayment. This Court disagrees with that result. The Owner was a single asset entity that was able to rely on bankruptcy to avoid liability. HUD and the lenders were able to rely on foreclosure. Certainly, Shelco should have (and did) file liens against the Project under state law, but these liens were subordinate to the lender's claims, and because the Owner was insolvent, were worthless. *See Embree Constr. Group v. Rafcor, Inc.* 411 S.E.2d 916, 921 (N.C. 1992) ("[w]hen a contractor's lien is subordinate to a construction loan mortgage, as here, or to prior encumbrances such as a purchase money mortgage, any lien on the owner's property or its improvements is worthless when the owner is insolvent."). It is for these reasons that courts allow contractors to assert equitable liens to recover amounts owed for their services that are enjoyed by lenders without compensating the contractors for their work. This Court concurs with the analysis in *C.D. Barnes* and *J.J. Deluca Co. Co., Inc. v. U.S. Dep't of Hous. & Urban Dev.*,

14

2008 WL 723329 (D.N.J. Mar. 14, 2008) (vacated on other grounds pursuant to settlement), in finding that the facts here call for an equitable lien to apply.

In finding for the contractor, the court in *Barnes* discussed the determinative facts leading to equitable relief, not the non-profit status of the owners, but rather on the structure of the deals and HUD's involvement in their financing. *Barnes*, 2008 WL 4534152 at * 9 ("The entire structure of the transaction encourages the formation of thinly-capitalized entities: (1) the owner entity is limited to a single asset (to which HUD and the lender alone may look to for security); (2) the loan is non-recourse, so the owners have no liability beyond any partnership assets; (3) HUD and the lender provide almost 100% financing; and (4) the loan proceeds are the only means of paying for the work on the project."). Deals such as these are not "typical marketplace transaction[s]." *Id.*

Similarly, in *Deluca*, the court held that HUD was highly involved in the development of the project through "its appraisals, evaluations, meeting with the [] owners, and the forms it provided. . . ." *Deluca*, 2008 WL 723329 at *12. Moreover, HUD knew from the beginning in that case that the owner was a single asset entity organized for the exclusive purpose of completing the project as the Owner is here. *Id.* HUD obtained a completed facility and "[a]llowing HUD to retain such a benefit without fully compensating [the contractor] would be unjust." *Id.*

The facts present here are more similar to the facts in *Barnes* and *Deluca* than they are to *Van-Tex* and *Taylor Woodrow*. Shelco was involved in a project with a single asset Owner whose mortgage was insured by HUD. Shelco completed its work and HUD obtained (and then sold the deed of trust to) a completed apartment building and garage. HUD was involved from the beginning in the project and remained highly involved at all stages, even waiving its own

15

requirements related to the amount of the completion assurance fund and the release of the retainage for this Project. Shelco was never paid. Equity and justice demand, and Fourth Circuit precedent does not forbid, the finding of an equitable lien here. Accordingly, the Court finds Shelco to have an equitable lien in the amount of $700,754 in the undisbursed loan proceeds.

    C.    The Effect of the Bankruptcy Proceedings.

Defendants argue that if plaintiff held an equitable lien on any of the Owner's assets as of the petition date of the bankruptcy sale, such as any unadvanced funds under the loan, then that interest was extinguished by the bankruptcy sale pursuant to § 363(f) of the Bankruptcy Code. Defendants attempt to extend the ruling in *In re Leckie Smokeless Coal Co.*, 99 F.3d 573 (4th Cir. 1996), to the situation here. Defendants argue that the Fourth Circuit concluded that the term "interest" under § 363(f) was broad and includes obligations that are connected to, or arise from the property being sold. *Id.* at 582. Therefore, defendants claim that the equitable lien Shelco holds was extinguished by the bankruptcy sale. This Court disagrees.

Shelco had a Chapter 44A lien on the Owner's property, which it does not dispute was extinguished by the bankruptcy sale. However, its equitable lien is on the undisbursed loan proceeds which cannot be rationally considered to be the property of the Owner as it defaulted on the loan and the proceeds were never advanced to the Owner by the lender. The undisbursed proceeds were part of the loan transferred to HUD and later Lenox. At no time were they in the possession of the Owner. The loan was never sold in bankruptcy, and therefore an interest in the undisbursed proceeds could not have been extinguished by the Owner's bankruptcy sale.

    D.    Pre-Judgment Interest.

Shelco argues that it is entitled to pre-judgment interest accruing from the time its unpaid invoices were due in full. The federal courts awarding a judgment on equitable lien claims to

16

contractors have awarded prejudgment interest from the date the payment should have been made to the contractor. *Trans-Bay*, 551 F.2d at 383; *Bennett*, 433 F. Supp. at 837. Because there is no federal statute governing prejudgment interest, the determination of a certain rate of prejudgment interest is generally a matter of discretion on the part of the district court. *U.S. v. Dollar Rent A Car Sys., Inc.*, 712 F.2d 938, 940 (4th Cir. 1983). Courts have held that state law applies to questions involving prejudgment interest in diversity cases, but where the jurisdiction of the court is based on a federal contract, not diversity, the district court is not bound by the interest rate of the forum state in determining the rate of prejudgment interest, but must use its discretion. *Id.* at 940–41. This case is based on neither diversity, nor federal contract, but on equity that the Court has applied federal law to decide. Accordingly, the Court will follow the lead of other federal courts in the matter and award pre-judgment interest. Shelco argues that the Court should order the North Carolina statutory rate of eight percent which was awarded on its earlier state lien judgment. However, as this Court did not rely on state law in reaching its determination of liability as to HUD, it sees no reason to apply a state interest rate to a debt owed by the federal government. Further, the purpose of prejudgment interest is to ensure that the plaintiff is made whole. *Monessen S.R. Co. v. Morgan*, 486 U.S. 330, 345 (1988). Accordingly, the Court awards interest at the prime rate compounded quarterly. *See Morpho Detection, Inc. v. Smiths Detection Inc.*, 2013 U.S. Dist. LEXIS 150376 at *4 (E.D. Va. Oct. 17, 2013) (finding the prime rate better compensates because it reflects the cost of borrowing money versus the cost of raising funds by the government represented by the 3 month Treasury Bill rate). The interest shall be calculated from the following dates: (1) January 10, 2010 on $6,948; (2) March 10, 2010 on $63,375; and (3) May 10, 2010 on $630,431. These dates are based on unpaid invoices that were presented by the 25th day of a month therefore becoming due on or about the 10th day of

the following month. Shelco reported unpaid invoices for the months of December 2009, and February and April 2010.

* * *

For the foregoing reasons, the Court grants Shelco's motion for partial summary judgment.

### III. DEFENDANTS LENOX AND HUD'S MOTIONS FOR SUMMARY JUDGMENT.

This Court has granted Shelco's motion for summary judgment on the matter of an equitable lien. Accordingly, HUD and Lenox's motions for summary judgment on the same matter is denied. Pursuant to this Court's November 1, 2012 order [DE 52], Lenox was joined as an additional party in this action. Lenox had asked to be substituted for HUD in the action on the basis that the loan sale agreement governing the loan assignment from HUD to Lenox specifically required that Lenox replace HUD in any ongoing litigation to which HUD is a party related to the instant loan and loan documents. The Court refused to substitute Lenox for HUD out of concern for Shelco's rights as against HUD. However, Lenox is a party to this suit based on HUD's actions. Therefore the Court finds that HUD and Lenox are jointly and severally liable for the amount awarded to Shelco.

Because this Court has granted Shelco's motion for summary judgment and in doing so found for and awarded Shelco with its entire claim, the Court declines to reach the arguments centered on claims for relief based on the theories of third-party beneficiary and negligence. Accordingly, HUD and Lenox's motions for summary judgment are denied.

### **CONCLUSION**

For the foregoing reasons, the plaintiffs' motion for partial summary judgment is GRANTED, Berkadia's motion for summary judgment is GRANTED, and defendants HUD and

Lenox's motions for summary judgment are DENIED. Plaintiff is AWARDED the amount of $700,754 plus prejudgment interest at the prime rate compounded quarterly (laid out *supra* Part II.D) and the costs of this action against defendants HUD and Lenox, jointly and severally. Attorney's fees are NOT AWARDED. The clerk is directed to enter judgment accordingly and to close the file.

SO ORDERED.

This the 28 day of October, 2013.

Terrence W. Boyle
TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE